UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF VIRGINIA
Roanoke Division

| | |
|---|---|
| JOHN DOE II | ) |
| | ) |
|        Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| VIRGINIA POLYTECHNIC INSTITUTE | ) |
| AND STATE UNIVERSITY, | ) |
| | ) |
| TIMOTHY SANDS, employee of Virginia | ) |
| Polytechnic Institute and State University, | ) |
| sued in his official and individual capacity | )   Civil Action No. _7:20CV440_ |
| | ) |
| FRANK SHUSHOK, JR., employee of | ) |
| Virginia Polytechnic Institute and State | ) |
| University, sued in his official and | ) |
| individual capacity, | ) |
| | ) |
| RANDALL D. FULLHART., employee of | ) |
| Virginia Polytechnic Institute and State | ) |
| University, sued in his official and | ) |
| individual capacity | ) |
| | ) |
|       Defendants. | ) |

## PLAINTIFF'S COMPLAINT

### Introduction

1.     John Doe II files this Complaint against Defendants Virginia Polytechnic Institute and State University, Timothy Sands, Frank Shushok, Jr., and Randall D. Fullhart, for violations of his rights under the procedural and substantive due process requirements, and the equal protection clause, of the Fourteenth Amendment to the United States Constitution, and state law claims for breach of contract and defamation.

2.     On October 18, 2019, Mr. Doe II, a senior student at Virginia Tech, and other junior and senior leaders of the Bravo Company, a unit of the Virginia Tech Corps of Cadets,

attended a routine, team-building event for sophomore members at Caldwell Fields campground. They performed group exercise. They hiked a mountain. They had a bonfire, spoke about Corps tradition, and awarded small pins for participating. The pins were placed on a shirt and tapped. The weather was mild. No one was hurt. All this was optional. It had been a Corps tradition for years. Afterwards, they shared a meal at Cook-Out Restaurant.

3.     Weeks later, an anonymous student complained to Virginia Tech that the upperclassmen had engaged in hazing at the event. He alleged the event was conducted in "secret"; that students were told to record different destinations when they signed out of their residence halls to attend; and, the upperclassmen warned them "not to tell anyone." The clear implication of his complaint was that if the team-building event had to be done in "secret," then the upperclassmen must have known it was wrong to proceed, and did so anyways.

4.     Virginia Tech launched an investigation. Officials interviewed sophomores who participated. Not a single one corroborated the original complaint that it was done in secret.

5.     Virginia Tech concluded its investigation and accused Mr. Doe II and his fellow upperclassmen of hazing.

6.     Virginia Tech scheduled a joint student conduct hearing to determine the truth of the allegations.

7.     One week before the joint student conduct hearing, Virginia Tech gave Mr. Doe II and the other accused students a packet of documents purportedly containing all the information that the investigators had gathered, e.g. witness statements, etc.

8.     Unbeknownst to the accused students, Virginia Tech officials had removed from the packet any statements from the original accuser, in an effort to hide his identity.

9.      In fact, Virginia Tech created a fake email chain among school officials to make it seem like the complaint originated with a senior administrator on November 4, 2019, when in reality, the student had made the original complaint on October 31, 2019.

10.     Virginia Tech intentionally mislead Mr. Doe II and the other accused students about how, when, and from whom, the initial complaint originated.

11.     Virginia Tech withheld any investigator notes, email, or other documents, from the accused students, referencing the original complaint.

12.     On December 9, 2019, Virginia Tech held its joint hearing for Mr. Doe II.

13.     On December 12, 2019, Virginia Tech found Mr. Doe II and the other accused students guilty of hazing. Hearing officers specifically referenced in their written decision the allegation that the event was done covertly and in "secret" – even though not a single student, except the anonymous accuser, made that accusation. In other words, hearing officers relied on allegations from an unknown, anonymous person, to reach their decision, without allowing the accused students any opportunity to confront and question the veracity of that allegation.

14.     Mr. Doe II was suspended for a semester.

15.     Mr. Doe II had an Army ROTC scholarship and had signed a contract with the Army to commission as an officer upon graduation.

16.     Due to his suspension, he is now subject to disenrollment with the ROTC, will forfeit his Army commission, and be forced to repay his scholarship upon graduation.

17.     At the time, Virginia Tech did not realize its suspension would cause Mr. Doe II to lose his commission and incur a scholarship debt.

18.     Mr. Doe II was denied his right to due process when Virginia Tech flagrantly withheld the identity, source, and nature of the original complaint that was used to adjudicate his

guilt. Even in the rudiments of a student conduct hearing, Virginia Tech fundamentally deprived Mr. Doe II of a fair process to contest the allegations. School officials created fake emails, withheld documents, and misled accused students about the basic facts of their case.

19.     Mr. Doe II now has a permanent mark on his record. Without help from this Court, he will lose his life's dream to serve his country as a Army officer. He may be forced to repay his scholarship after graduation. He asks this Court to grant declaratory and injunctive relief setting aside the conduct hearing result as violative of the U.S. Constitution.

**Parties**

20.     Plaintiff John Doe II ("Mr. Doe II") is, and at all times relevant to this Complaint has been, a resident of a state other than Virginia.

21.     Defendant Virginia Polytechnic Institute and State University ("Virginia Tech") is a public university incorporated, and with its principal place of business located, in Virginia.

22.     Defendant Timothy Sands is or was at pertinent times the President of Virginia Tech and resides in Virginia.

23.     Defendant Frank Shushok, Jr., is or was at pertinent times a Vice President for Virginia Tech and resides in Virginia.

24.     Defendant Randall G. Fullhart, is or was at pertinent times the Commandant of the Corps of Cadets for Virginia Tech and resides in Virginia.

**Jurisdiction and Venue**

25.     This action arises under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983. Jurisdiction is vested in this Court pursuant to 28 U.S.C. §§ 2201, 2202, 1331 and 1343.

26.     Venue is proper pursuant to 28 U.S.C. § 1391. Virginia Tech is a public university created under the Virginia Code, incorporated and with its principal place of business in this district. The errors and omissions giving rise to Plaintiff's claims took place in this district.

### Facts

27.     Since its founding, Virginia Tech has offered military training to its students through the Virginia Tech Corps of Cadets ("Corps").

28.     In 2019, Mr. Doe II was a senior at Virginia Tech  and member of the Corps.

29.     Mr. Doe II was a senior in Bravo Company, a Corps unit.

30.     On October 18, 2019, the Bravo Company held a voluntary integration event for sophomore members of the company.

31.     The purpose of the team-building event, which had been held for years, was to foster camaraderie among the members.

32.     The team-building event had been approved by Mr. Doe II's superiors.

33.     The event was entirely voluntary.

34.     Anyone who was a member of Bravo Company before the event would continue to be so in good standing regardless of whether they participated in the event or not.

35.     A group of about 21 juniors and seniors led the event, and about 20 sophomores voluntarily participated.

36.     Participants met at Caldwell Fields to perform a variety of exercises for physical training. Then, the group undertook a hike, stopping at various points.

37.     Mr. Doe II did not draft or assist in drafting the operations order that was presented to approve the event.

38.     Mr. Doe II was simply informed of the date, time, and location, of the event, and he showed up. Mr. Doe II did not arrive at the event until several hours after it started, by which point most of the activities had already concluded.

39.     At the conclusion of the hike, the group went back down and had a bonfire where one of the platoon leaders gave a speech about Bravo Company.

40.     A ceremony was held where the members were given a pin to recognize their participation.

41.     Upon information and belief, each sophomore brought their own pin.

42.     The pin involved is a small company pin.

43.     It is placed on a person's shirt and tapped. Participation in this ceremony is entirely voluntary.

44.     Each Bravo pin that was used was sterilized with rubbing alcohol prior to being used.

45.     Participation in the pin ceremony was entirely voluntary; no one was pinned who did not want to be.

46.     Absolutely no drugs or alcohol were involved.

47.     A sophomore asked Mr. Doe II to pin him, which he did.

48.     The sophomore later attested at Mr. Doe II's hearing that "Doe II took care to gently tap my pin in. He did not break my skin and did not seek to induce any bodily harm."

49.     No witness ever testified that Mr. Doe II committed "blood pinning."

50.     Further, in regards to other cadets, no one was injured during the event.

51.     The integration event was no different than it had been for many years.

52.     During Mr. Doe II's time at Virginia Tech, Corps cadets routinely performed grueling events involving physical training throughout the year.

53.     He also participated in Platoon Tactical Challenge, in which cadets conduct physical fitness, obstacles, and other timed events.

54.     Mr. Doe II was also pinned during his own sophomore integration event.

55.     Virginia Tech staff were aware of the events and allowed them to go forward.

56.     The Corps also displayed a photo in its hall of a prior year integration event where team members had been pinned according to Corps tradition.

57.     This photo remained on display on campus when the October 18, 2019, event took place.

58.     Notwithstanding Corps history and tradition, this year, an unidentified student contacted Virginia Tech to allege the event constituted hazing, and Bravo Company's juniors and seniors acted covertly to avoid oversight.

59.     As a result of the anonymous complaint, Virginia Tech launched an investigation into whether Mr. Doe II, and others, violated its hazing policy.

**Investigation**

60.     The investigation should have proceeded in accordance with Virginia Tech policy, but it did not.

61.     Mr. Doe II and Virginia Tech had agreed to be bound by the *Hokie Handbook*, 2019-2020 ("Handbook") and the *Virginia Tech Corps of Cadets Regulations*, July 2019 ("Corps Manual") to adjudicate matters of alleged misconduct and violations of university policy.

62.     The Handbook incorporated by reference the Corps Manual and set forth the procedure for alleged violations by cadets of university policies:

> *Alleged conduct violations by cadets of university policies and/or Corps of Cadets regulations are adjudicated either by the Cadet Executive Committee or a Deputy Commandant hearing.*
>
> *…Cadet regulations stipulate the detailed process of adjudicating alleged cadet misconduct.*

63.     The applicable "cadet regulations" referenced in the Handbook are set forth under a section entitled "rights of the accused" in the Corps Manual, including:

> *2. Be informed of the identity of the accuser(s) or the circumstances leading to the hearing*
>
> *…*
>
> *8. Cross-examine witnesses who are provided for in accordance with this regulation*
>
> *…*
>
> *10. Have evidence, including documents or physical evidence, within the control of Corps or University authorities produced in accordance with this regulation*

64.     Therefore, Mr. Doe II was guaranteed under the Handbook and Corps Manual, to be afforded the following process during the investigation of the October 18, 2019, event: to be informed of the identity of his accuser or circumstances leading to the hearing; to cross-examine witnesses against him; and, to be given the documents and other evidence within the control of University authorities.

65.     As set forth below, Virginia Tech failed to uphold Mr. Doe II's rights as set forth in its own policies.

66.     Virginia Tech failed to inform Mr. Doe II of the identity of his accuser.

67.     Virginia Tech failed to inform Mr. Doe II of the circumstances leading to the hearing.

68.     Virginia Tech failed to allow him an opportunity to cross-examine his accuser.

69.     Virginia Tech failed to give Mr. Doe II all documents and evidence within its control prior to the hearing.

70.     On October 31, 2019, Ennis McCrery, Director of Student Conduct at Virginia Tech, spoke with an anonymous student about the team-building event.

71.     Ms. McCrery took notes during the meeting.

72.     On November 1, 2019, Ms. McCrery emailed her notes to Dr. Shushok, Vice President of Student Affairs at Virginia Tech, and Frances Keene, Assistant Vice President of Student Affairs at Virginia Tech, following her meeting with the student.

73.     Ms. McCrery told Dr. Shushok and Dr. Keene that the student shared "A LOT" and her notes were "pretty generic."

74.     Ms. McCrery told Dr. Shushok and Dr. Keene that she wanted to talk through how to approach Randall Fullhart, Commandant of the Corps, about the situation.

75.     On November 3, 2019, Dr. Shushok emailed Ms. McCrery and Dr. Keene and suggested that they "paired [Ms. McCrery's] narrative down a lot and only shared" a sanitized version of the complaint that Dr. Shushok had typed up.

76.     Dr. Shushok suggested that Dr. Keene then "write an e-mail to me indicating receipt of the complaint [that Dr. Shushok typed]" that he could then send to Mr. Fullhart so that it "doesn't expose that it is coming from a particular student."

77.     When Dr. Shushok suggested to Ms. McCrery they keep the student's identity anonymous, and that Dr. Keene fabricate an email to obfuscate the source and full scope of the

student's accusations, he knew, or should have known, that the Corps Manual stated that students like Mr. Doe II had a right to know and cross-examine their accuser in misconduct matters.

78.     Dr. Shushok knew, or should have known, that he was intentionally disregarding Mr. Doe II's rights as a student accused of misconduct, when he went to great lengths to re-package the original student's complaint and create a fake email chain to hide its source.

79.     On November 4, 2019, Dr. Keene sent the email to Dr. Shushok with an exact copy of the complaint that Dr. Shushok had drafted, omitting any reference to the original accuser, the full details of his accusations, or even that a student had made the complaint.

80.     Dr. Shushok forwarded the email to Mr. Fullhart to initiate an investigation into whether the October 18, 2019, event constituted hazing.

81.     Virginia Tech assigned Craig Alia, Deputy Commandant of the Corps, and Ms. McCrery, to investigate the hazing allegation.

82.     Mr. Alia had a conflict of interest because he was also a witness to the October 18, 2019, event.

83.     Mr. Alia was a member of Corps staff.

84.     One of Mr. Alia's jobs was to sign-off on operations orders that students drafted in advance of their team-building events.

85.     In the Bravo Company case, Mr. Alia would later claim that he never saw or approved the operations order for the October 18, 2019, event, thereby providing further evidence that it was done in secret or unsanctioned.

86.     In essence, Mr. Alia was a witness. He would offer testimony that the event had not been approved by him.

87.     Notwithstanding Mr. Alia's interest in the case as a witness, Virginia Tech allowed him to serve a dual role as the investigator into what transpired.

88.     On November 4, 2019, Mr. Alia ordered various members of Bravo Company to report for a mandatory meeting.

89.     Sophomores were taken to a separate room, where they were instructed to make statements about what happened, and if they refused, they would face punishment.

90.     Each sophomore present wrote a written statement.

91.     Not a single sophomore said Mr. Doe II engaged in an act of hazing.

92.     Sophomores wrote:

    a.   "We began doing some light PT"

    b.   "We had the option to get blood pinned"

    c.   "After that we went to Cook-Out"

    d.   "They stated [pinning] was optional"

    e.   "Juniors didn't antagonize" or make anyone do it

    f.   "There were cars and flashlights to see"

    g.   "It was made clear…if we did not want to participate, we did not have to"

    h.   "I personally enjoyed the event"

    i.   "I do not find it appropriate to describe the event as hazing"

    j.   "It was made VERY CLEAR that the entire event was optional"

93.     Not a single student corroborated the anonymous complaint suggesting that the event was conducted in "secret" or "unsanctioned."

94.     On November 6, 2019, Ms. McCrery emailed Dr. Shushok and Dr. Keene to say she and Mr. Alia would have the final investigation report completed within a week.

95.    Dr. Shushok asked, "How's our complainant?"

96.    Ms. McCrery said that he was "pretty stressed" but was "okay." She said that she had spoken with him that night, and "of course, everyone is wondering who told." She said he was "pretty special" and "what a difference this situation will make for future members of the Corps." She said she wished they could give the student a "Courageous Leadership" award.

97.    On November 18, 2019, Ms. McCrery and Mr. Alia finished their report.

98.    On November 25, 2019, Ms. McCrery sent Mr. Doe II a letter advising that he had been charged with violations of university policy involving hazing.

99.    On December 2, 2019, Ms. McCrery met with Mr. Doe II, and the other accused students, for a prehearing meeting.

100.   Ms. McCrery gave the accused students a packet of documents containing the final report, witness statements, and other documents gathered in the investigation.

101.   In the packet, Ms. McCrery withheld a) any meeting notes with the accuser on October 31, 2019, b) any meeting notes with the accuser on November 6, 2019, and c) any email, documents, or other items of evidence that the accuser submitted to initiate the investigation.

102.   The final report was dated November 18, 2019.

103.   The final report was not given to students until December 2, 2019.

104.   A joint student conduct hearing was scheduled for December 9, 2019.

105.   The students had less than a week to prepare a defense.

106.   The final investigative report stated:

On November 4, 2019, Interim Vice President of Student Affairs Dr. Frank Shushok received a report from Interim Vice of Student Affairs Dr. Frances Keene alleging that students in Bravo Company held a secret, unsanctioned 'sophomore integration event' on or about October 18, 2019. Specifically, the report states the following:

*Around 6:00 p.m., Bravo Company departed by car to the event and were warned not to tell anyone. Sophomores were instructed not to write "integration" when they signed out and to record different destinations so as not to draw attention to the fact that a large group was leaving together.*

*As part of the "integration" (lasting around 4 hours) cadets went to Caldwell Fields where they:*
*1) were required to do pushups and sit ups in the parking lot*
*2) led in "rat line" to a creek to take "Bravo Baths" in the creek*
*3) Alternated bear crawls, crab walks, and other exercises back to the parking lot*
*4) Climbed a mountain and were instructed to bear crawl, crab walk, with pushups in between*
*5) Given weighted vests and instructed to run up and down for several miles*
*6) "Blood pinned" by upperclassmen (i.e., upperclassmen pounded a company pin into a sophomore's chest)*

Dr. Shushok referred this report to Major General Randy Fullhart, Commandant of the Corps, and Ennis McCrery, Director of Student Conduct, for a joint investigation.

107.    As written, the final report gave the impression that the "italicized text" directly quoted the original accuser. It did not. Dr. Shushok drafted that section on November 3, 2019, based second-hand on Ms. McCrery's notes from her meeting on October 31, 2019. He sent it to Dr. Keene, to send back to him on November 4, 2019, to "start" the investigation.

108.    The final report misled the accused students and the hearing officers who presided over the case on December 9, 2019 into believing that the complainant had been directly quoted in the italics and reported the allegation on November 4, 2019; this information was false.

109.    Virginia Tech knowingly misled its own students and hearing officers about the true source, substance, and nature of the hazing complaint, in the final report to the parties.

### Student Conduct Hearing

110.    On December 9, 2019, Mr. Doe II and the other accused students appeared for a joint hearing to determine whether they had violated the hazing policy.

111.    On the eve of the hearing, Mr. Alia contacted another cadet by email and advised him how to plead the next day. He said to accept responsibility, stay focused on the "big picture," and "we can work around anything else."

112.    Mr. Alia did not refer the cadet to an independent advisor for advice on how to plead the next day at the hearing.

113.    The hearing officers consisted of two Virginia Tech staff: one, from the Corps, the other, from the Office of Student Conduct. Neither had participated in the investigation.

114.    The hearing officers advised that the students had the right to plead responsible, not responsible, or no plea, to the charges.

115.    The accused students entered their pleas.

116.    After entering pleas, the hearing officers heard opening statements from the accused students.

117.    Next, the hearing officers reviewed the contents of the investigator's report and the various written statements from the sophomores who were present at the event.

118.    The hearing officers then heard testimony from the accused students, including Mr. Doe II, who stated that he was a senior member of Bravo Company; the event had been a Corps tradition; no one was injured; and, the event was voluntary.

119.    The hearing officers did not hear testimony from the original accuser because as noted above, he was never identified.

120.    During a break, Mr. Alia told another cadet to change his plea to responsible mid-way through the hearing.

121.    Following the hearing, Mr. Doe II and others were found responsible for violating the Virginia Tech's hazing policy.

122.    The evidence did not support a finding of hazing.

123.    None of the sophomores who were interviewed suggested that the event was hazing; no one was hurt, injured, or endangered; the event itself was a Corps tradition; and, there was no evidence, other than from the anonymous accuser, that the event was held in secret to evade detection from university authorities.

124.    Specifically in regards to Mr. Doe II, not a single witness said he committed an act of "blood pinning." The sophomore whom he pinned stated that Mr. Doe II merely placed the pin through his shirt and took extra care not to breach the skin. Nonetheless, Virginia Tech concluded that Mr. Doe II had "blood pinned," notwithstanding that there was no evidence in the record whatsoever that Mr. Doe II had done anything more than put a pin through the sophomore cadet's shirt; Virginia Tech's findings ignored the record before it. Moreover, the school's written finding against Mr. Doe II referenced Bravo Baths, which meant performing exercise in a shallow creek, but, Mr. Doe II had not arrived until hours after the event started and was not present for the Bravo Baths and no evidence suggested he had been there for it.

125.    As punishment for the finding of responsibility, Virginia Tech suspended Mr. Doe II for one semester.

126.    Students were advised that they had a right to appeal on the following grounds (1) denial of procedural guarantees; (2) significant and relevant new evidence that was not available at the time of the hearing; and (3) sanctions/findings that are unduly harsh or arbitrary.

127.    Mr. Doe II appealed the hearing outcome.

128.    Dr. Keene presided over the appeals.

129.    Dr. Keene denied Mr. Doe II's appeal.

130.    As a result of the Defendants' actions, Mr. Doe II has suffered damages, including disruption of his educational progress; embarrassment; and, loss of good name.

131.    Furthermore, Mr. Doe II is subject to disenrollment this summer from the Army ROTC, thereby forfeiting his ability to commission, resulting in repayment of his scholarship. Absent injunctive relief, Mr. Doe II will lose his commission and incur the cost of repaying more than $65,000 in ROTC scholarship funds, Virginia Tech expenses, and other costs.

### Virginia Tech's Response to Past Incidents Involving the Corps

132.    The outcome of Virginia Tech's 2019 investigation of Bravo Company contrasts with how Virginia Tech and the Corps of Cadets considered similar allegations in the past.

133.    In 2018, Virginia Tech investigated a "sophomore integration" event involving another unit in the Corps of Cadets, the Foxtrot Company.

134.    The sophomores in Foxtrot Company were subjected to far harsher treatment than the sophomores in Bravo Company. Among other things, the Foxtrot sophomores were made to eat a banana quickly then chug a Sprite; given banana peels to eat; made to eat food that had fallen into the dirt; covered in honey and sprayed with water; required to crawl through a mud puddle in cold weather; verbally berated and humiliated, including with racial slurs; and, forced to participate in a "fight club" circle which resulted in actual injuries to participants.

135.    Virginia Tech investigated the Foxtrot Company.

136.    Despite the severity of the above conduct, no students were suspended. At most, students were given deferred suspensions and permitted to remain in school.

137.    In 2017, Virginia Tech investigated a training event at the Duck Pond involving the Hotel Company. The Duck Pond event involved physical exercise in shallow water and mud.

138.    No students were injured, similar to Bravo Company. The six cadets found responsible were reprimanded and required to meet with Corps staff for a remedial assignment.

139.    Virginia Tech has asserted that all student conduct sanctions are based on case precedent. But, the Foxtrot incident and the Duck Pond event demonstrate this assertion is false.

140.    The Foxtrot incident and Duck Pond event demonstrate that the University's punishment against Mr. Doe II and the other accused students in 2019, involving circumstances far less severe than Foxtrot just months earlier, was completely arbitrary and capricious.

### COUNT I – VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT PURSUANT TO 42 U.S.C. § 1983 – PROCEDURAL DUE PROCESS (AGAINST ALL DEFENDANTS)

141.    Mr. Doe II realleges the foregoing paragraphs.

142.    At the time Mr. Doe II attended Virginia Tech, the university had in place a system of expelling, suspending, or dismissing students, only after a finding of cause, in accordance with its policies and procedures in the Handbook.

143.    Virginia Tech, through the specific policies and procedures set forth in its Handbook, created a reasonable expectation that Mr. Doe II, so long as he abided by the code of conduct established therein, and otherwise paid his tuition and achieved satisfactory grades, would not be removed from the university or deprived of his right to pursue his degree, but for application of the system that Virginia Tech had enacted in student conduct matters.

144.    Therefore, Mr. Doe II had a protected property interest in his education at Virginia Tech because, once he accepted his offer of admission and paid his tuition, and so long as he abided by the Handbook, he was entitled to enrollment at Virginia Tech.

145.    Mr. Doe II suffered a deprivation of a property interest when he was  suspended for one semester from Virginia Tech, which as a result, will inhibit his ability to keep his enlistment contract with the U.S. Army and ROTC scholarship.

146.    Mr. Doe II also has a constitutionally protected liberty interest in his good name, reputation and integrity.

147.    The due process protections of the Fourteenth Amendment to the United States Constitution apply to the disciplinary process used by Virginia Tech against Mr. Doe II.

148.    Mr. Doe II was entitled to process commensurate with the seriousness of the charge of hazing and the potential discipline he faced. The allegation was serious and resulted in harsh sanctions, as well as the prospect of a lifelong stigma that will foreclose future educational and employment opportunities.

149.    Mr. Doe II was entitled to a fundamentally fair procedure to determine whether he was responsible for the alleged misconduct.

150.    Defendants failed to provide adequate procedural due process when they

1) failed to identify Mr. Doe II's accuser,

2) failed to provide him with an opportunity to confront and question his accuser,

3) failed to provide him before the formal hearing with all the evidence in its possession, including the original complaint, meeting notes, and other items;

4) fabricated an email chain to obfuscate the nature, substance, and identity of his accuser; and,

5) allowed Mr. Alia to serve multiple roles as a witness, an investigator, and an advisor, in one instance contacting a student on the eve of the hearing to plead guilty.

6) denied Mr. Doe II a meaningful appeal because Dr. Keene had received evidence early in the investigation that was not shared with the accused students, and participated in the email chain that hid the identity of the accuser, casting doubt on her ability to serve as a neutral appellate officer to fairly hear Mr. Doe II's appeal.

151.    As a result of the due process violations, Mr. Doe II was wrongly disciplined and suffers ongoing harm to his good name and educational progress. He has incurred attorneys' fees and is at jeopardy of losing his ability to commission and incurring a repayment debt of his ROTC scholarship.

### COUNT II – VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT PURSUANT TO 42 U.S.C. § 1983 – SUBSTANTIVE DUE PROCESS (AGAINST ALL DEFENDANTS)

152.    Mr. Doe II realleges the foregoing paragraphs.

153.    Irrespective of the fairness of the procedures utilized, the Fourteenth Amendment to the United States Constitution also protects Mr. Doe II's property interests under substantive due process from government intrusion which is arbitrary and capricious.

154.    Virginia Tech has a long history of permitting students in the Corps to conduct integration events that include physical training exercises and optional pinning. Indeed, there was a picture hanging in the Corps hall documenting such an event the previous year.

155.    Virginia Tech received notice in November 2019 from counsel for an accused student of hazing in other companies. But, Virginia Tech declined to investigate or bring sanctions against anyone else, other than Mr. Doe II and the members of Bravo Company.

156.    The failure to investigate other allegations demonstrates that the investigating officers and Virginia Tech were not interested in holding accountable everyone who engaged in such an act, but rather in casting blame on a few cadets to answer a specific complaint.

157.     Most importantly, no one, other than the anonymous, unnamed, unidentified complainant, seems to suggest Mr. Doe II and others committed hazing. The overwhelming weight of evidence suggests that the event was safe, voluntary, and optional.

158.     Accordingly, it was arbitrary and capricious for Defendants to punish Mr. Doe II for hazing, when the facts do not support it, the same conduct had been allowed in the past, and other conduct has gone uninvestigated.

159.     As a result of the substantive due process violations, Mr. Doe II was wrongly disciplined and suffers ongoing harm to his good name and educational progress.

## COUNT III – BREACH OF CONTRACT
## (AGAINST VIRGINIA TECH)

160.     Mr. Doe II realleges the foregoing paragraphs.

161.     Mr. Doe II provided Virginia Tech with sums of money for his education, and in return, Virginia Tech contracted to provide Mr. Doe II with access to its degree program.

162.     Mr. Doe II's enrollment in, and attendance of, classes at Virginia Tech created an expectation that he would be allowed to continue his course of study until he earned his degree from Virginia Tech, provided that he maintained satisfactory grades and complied with Virginia Tech's rules and policies.

163.     Accordingly, as a condition of Mr. Doe II's enrollment at Virginia Tech, an express contractual relationship existed between Virginia Tech and Mr. Doe II, under which each party owed the other certain duties in the Handbook and the Corps Manual.

164.     Virginia Tech had a duty not to suspend Mr. Doe II for violations of university conduct policy without affording him the "rights of the accused" set forth in the Corps Manual:

> *2. Be informed of the identity of the accuser(s) or the circumstances leading to the hearing*

...

*8. Cross-examine witnesses who are provided for in accordance with this*

*regulation*

...

*10. Have evidence, including documents or physical evidence, within the control*

*of Corps or University authorities produced in accordance with this regulation*

165.    Virginia Tech breached its duty under the Corps Manual when it failed to inform

him of the identity of his accuser; allow him to cross-examine his accuser; or, provide all the

evidence in its possession, prior to suspending him for his role in the October 18, 2019, event.

166.    As a result of Virginia Tech's breach of contract, Mr. Doe II suffered damages,

including disruption of his educational progress; embarrassment; and, loss of good name.

## COUNT IV – VIOLATION OF THE EQUAL PROTECTION CLAUSE
## (AGAINST ALL DEFENDANTS)

167.    Mr. Doe II realleges the foregoing paragraphs.

168.    The Fourteenth Amendment to the United States Constitution provides: "No State

… shall…deny to any person within its jurisdiction the equal protection of the laws."

169.    Pursuant to 42 U.S.C. § 1983: "Every person who, under color and authority of

any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of

Columbia, subjects, or causes to be subjected, any citizen of the United States or other person

within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured

by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity,

or other proper proceeding for redress, except that in any action brought against a judicial officer

for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be

granted unless a declaratory decree was violated or declaratory relief was unavailable."

170.    Under the Fourteenth Amendment to the United States Constitution, all persons similarly situated must be treated alike. Thus, if a class of persons similarly situated to another class have been treated disparately, the Fourteenth Amendment has been violated.

171.    Mr. Doe II and the other accused students in Bravo Company were in all relevant respects similarly situated to the cadets in Foxtrot Company who were charged with hazing due to the Foxtrot incident.

172.    However, Mr. Doe II and the other accused students in Bravo Company were treated disparately compared to Virginia Tech's treatment of the Foxtrot Company cadets.

173.    Specifically, Virginia Tech imposed sanctions far less serious than those imposed against Mr. Doe II and the other accused students in Bravo Company, for conduct that was objectively more severe than the conduct alleged to have been committed by Mr. Doe II and the other accused students in Bravo Company. No Foxtrot Company students were suspended; at most, they received deferred suspensions.

174.    As a result of this violation of the equal protection clause, Mr. Doe II was wrongly disciplined and suffers ongoing harm to his good name and educational progress. He has incurred attorneys' fees, lost scholarship funds, and is at jeopardy of losing his full Army commission and incurring a repayment debt of his scholarship. Furthermore, as a consequent of Defendants' actions, Mr. Doe II's military career is in jeopardy, and his chances for promotions and positions within the military will be adversely affected.

### COUNT V – DEFAMATION BY IMPLICATION
### (AGAINST VIRGINIA TECH AND FULLHART)

175.    Mr. Doe II realleges the foregoing paragraphs.

176.    On January 23, 2020, Mr. Fullhart, in his capacity as an employee of Virginia Tech, gave a speech to the Virginia Tech Corps of Cadets during a Corps-wide assembly.

177.   During Mr. Fullhart's speech, he spoke at length about the Bravo Company team-building event.

178.   He told the assembled cadets:

    a.   "There were cadets here last semester that are no longer here, now."

    b.   "Blood pinnings were a part of the experience."

    c.   "In the course of the discussion between all those who were participating, you know, it was 'made clear' [air quotes] that this was optional – that you don't have to do it. 'We'll think the same of you whether you do it or not.' But, some people suggested otherwise. And, certainly, some of the people who were involved on the receiving end thought otherwise."

179.   When Mr. Fullhart was speaking about the "cadets…that are no longer here," the cadets in the audience knew he was referring to Mr. Doe II and the other cadets who had been suspended by the university.

180.   When Mr. Fullhart said "some people" suggested the event was not voluntary, he knew, or should have known, that he was making a false statement. He implied that there had been a group of students who went through the event who thought it was compulsory. He knew or should have known that was flat-out false. Only one student – an anonymous complainant – ever suggested the event was compulsory. No other student interviewed on record went so far as to suggest that the event was anything other than voluntary.

181.   Mr. Fullhart went on to talk about pinning:

    a.   "So let me talk about blood pinning."

    b.   "For those of you who don't know, blood pinning in the context of the military: if we go back decades, there were practices where, in certain

organizations or after certain training when events were successfully completed, there was a ceremony including where they took the pin that you normally wear on your uniform and they'd slap it on you to the point that it would go through your uniform, maybe into your skin. There was blood involved. That's where the term blood pinning comes from. I know when I was first starting out as an Air Force officer, there was a practice of 'tapping on' your rank. So, especially if you were an enlisted member and you got to sew on rank, they'd maybe say, 'Congratulations! You've been promoted from tech sergeant to master sergeant.'"

c.   "A couple people would come up to you with a piece of tape and they'd put the rank over the old rank. And then, they'd all count to three and just slam the crap out of you [punching gesture]."

d.   "I can show you a video from the United States Navy from 2014, where it showed, that practice on a Navy ship, and what happened to the individuals who were involved in it, and the person who allowed it to happen to them."

e.   "Imagine being hit so many times by your peers that you can't get your arms over your shoulders because of the damage."

182.   When Mr. Fullhart characterized blood pinning as "slam[ing] the crap" out of someone with a pin, "being hit so many times" that "you can't get your arms over your shoulders because of the damage," he was implying in the context of his speech that the cadets of Bravo Company had injured their peers during the team-building event, to the extent that they had used force, punching, and inflected severe, debilitating injury.

183.     When Mr. Fullhart used the above characterizations of pinning – in the context of speaking about the Bravo Company team-building event – he knew, or should have known, that he was falsely misrepresenting what took place. No cadet – not even the anonymous student who made the complaint – *ever* said that Mr. Doe II or his peers "slam[med] the crap" out of the person who received a pin, or "hit" them "so many times" that they could not lift their arms. Mr. Fullhart's characterization of the pinning by Bravo Company was false, misleading, and made Mr. Doe II and his peers out to be extreme and careless, and portrayed Mr. Doe II and his peers in a deeply negative, false light. Mr. Fullhart should have known from his own investigation that not a single cadet described the pinning as he described it.

184.     Overall, when Mr. Fullhart told the assembled cadets that Mr. Doe II and his peers were no longer with them, claimed that multiple students had complained, and described extreme acts of pinning, he knew, or should have known, he was creating in the minds of his audience the defamatory implication that Mr. Doe II and his peers were suspended because they violently attacked unwilling sophomores in a manner he described.

185.     The implication created by Mr. Fullhart's description was false.

186.     Falsely accusing a person of an act of violence is defamatory per se.

187.     As a direct and proximate result of the above conduct, Mr. Doe II has sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries, reputational damages, and other direct and consequential damages.

188.     He is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, and costs.

## **DEMAND FOR JUDGMENT**

WHEREFORE, Mr. Doe II requests the Court award the following relief, and enter a judgment against the Defendants, jointly and severally:

a.     A declaratory judgment that the Defendants violated Mr. Doe II's rights to due process;

b.     A preliminary injunction requiring the Defendants to expunge Mr. Doe II's suspension; remove the misconduct finding from his record; and, allow Mr. Doe II to register for classes for the next available semester;

c.     A permanent injunction requiring Defendants to: expunge Mr. Doe II's records at Virginia Tech of any indication of a finding that he committed an act of hazing or was the subject of discipline;

c.     A permanent injunction enjoining Defendants from: (i) continuing to enforce any sanction against Mr. Doe II for alleged hazing; (ii) making any notation in Mr. Doe II's educational or disciplinary records related to the incidents described in this Complaint; and, (iii) making any disclosure to a third party that any adverse disciplinary action was taken against Mr. Doe II arising out of the incidents described in this Complaint;

d.     An award of Mr. Doe II's attorneys' fees and costs pursuant to 42 U.S.C. § 1988, 28 U.S.C. § 1920, and any other appropriate authority;

e.     An award of compensatory damages in an amount to be determined at trial for disruption of Mr. Doe II's educational progress, embarrassment, loss of his Army commission and repayment of his ROTC scholarship, and loss of good name; and

f.     An award of punitive damages in an amount to be determined at trial; and,

g.      Any other further relief as the Court deems just and appropriate.

July 30, 2020                          Respectfully submitted,

                                      JOHN DOE II


By:_____
                                              Of Counsel

Robert E. Dean, Esq. (VSB No. 80288)
ROB DEAN LAW
401 Campbell Ave., Ste. 302
Roanoke, Virginia 24016
Phone:  (540) 585-1776
Fax:       (540) 301-0833
Email:    rob@robdeanlaw.com

*Counsel for Plaintiff*